**CONSOLIDATED GAS TRANSMISSION CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Maryland Office of People's Counsel, Columbia LNG Corporation, Public Service Commission of the State of NY, Public Utilities Commission of OH, et al., Columbia Gas Transmission Corporation, Public Service Commission of West Virginia, Intervenors.**

**NIAGARA MOHAWK POWER CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Maryland Office of People's Counsel, Columbia LNG Corporation, Public Service Commission of the State of NY, Public Utilities Commission of OH, et al., Columbia Gas Transmission Corporation, Public Service Commission of West Virginia, Consolidated System LNG Company, et al., Intervenors.**

**CONSOLIDATED SYSTEM LNG COMPANY and Consolidated Gas Transmission Corp., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Niagara Mohawk Power Corporation, Maryland Office of People's Counsel, Columbia Gas Transmission Corporation, Intervenors.**

**COLUMBIA LNG CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Maryland Office of People's Counsel, Consolidated System LNG Company, Columbia Gas Transmission Corporation, Public Service Commission of West Virginia, Cincinnati Gas & Electric Company, ·et al., Intervenors.**

PUBLIC SERVICE COMMISSION of
the State of New York, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

State of Ohio, et al., Maryland Office of
People's Counsel, Consolidated System
LNG Company, Columbia Gas Trans-
mission Corporation, Public Service
Commission of West Virginia, Colum-
bia LNG Corporation, Intervenors.

NIAGARA MOHAWK POWER
CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Maryland Office of People's Counsel,
Consolidated System LNG Company,
Columbia Gas Transmission Corpora-
tion, Columbia LNG Corporation, In-
tervenors.

Nos. 84–1240, 84–1256, 84–1323, 84–1324,
84–1328 and 84–1342.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 3, 1985.
Decided Sept. 17, 1985.

John E. Holtzinger, Jr., Washington, D.C., with whom Charles R. Brown, Joseph E. Stubbs, and James L. Blasiak, Washington, D.C., were on brief, for Consol. System LNG Co., and Consol. Gas Transmission Corp., petitioners in Nos. 84–1240 and 84–1323 and the joint brief for intervenors in Nos. 84–1256, 84–1324, 84–1328 and 84–1342.

Harry H. Voigt, Washington, D.C., with whom L. Charles Landgraf and Mindy A. Buren, Washington, D.C., were on brief, for Niagara Mohawk, petitioner in Nos. 84–1256 and 84–1342 and intervenor in No. 84–1323.

L. Michael Bridges, Earl L. Fisher, and Hart T. Mankin, Wilmington, Del., were on brief for Columbia LNG Corp., petitioner in No. 84–1324 and the joint brief for Columbia LNG Corp., et al., intervenor in Nos. 84–1240, 84–1256, 84–1328 and 84–1342.

Richard A. Solomon, Washington, D.C., with whom David E. Blabey, Albany, N.Y., was on brief, for Public Service Com'n of New York, petitioner in No. 84–1328 and intervenor in Nos. 84–1240 and 84–1256.

Andrea Wolfman, Atty., F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Sol., F.E.R.C., Washington, D.C., was on brief for respondent in Nos. 84–1240, 84–1256, 84–1323, 84–1324, 84–1328 and 84–1342. Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., entered an appearance for respondent.

Robert S. Tongren and M. Howard Petricoff, Columbus, Ohio, were on brief for State of Ohio and the Public Utilities Com'n of Ohio, intervenors in Nos. 84–1240, 84–1256 and 84–1328.

John K. Keane, Jr. and Thomas C. Gorak, Baltimore, Md., were on brief, for Maryland People's Counsel, intervenor in Nos. 84–1240, 84–1256, 84–1323, 84–1324, 84–1328 and 84–1342.

Richard E. Hitt entered an appearance for Public Service Com'n of West Virginia,

**1540**

intervenor in Nos. 84–1240, 84–1256, 84–1324 and 84–1328.

Glen L. Kettering entered an appearance for Columbia Gas Transmission Corp., intervenor in Nos. 84–1240, 84–1256, 84–1323, 84–1324, 84–1328 and 84–1342.

James J. Mayer, Cincinnati, Ohio, entered an appearance for Cincinnati Gas & Elec. Co., et al., intervenors in No. 84–1324.

Before WALD and STARR, Circuit Judges and PARKER,* District Judge.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioners and intervenors in these consolidated cases challenge various aspects of an opinion by the Federal Energy Regulatory Commission ("FERC" or "Commission") interpreting the minimum bill provision of a tariff for resale of liquefied natural gas ("LNG") imported from Algeria and regasified at a facility in Cove Point, Maryland. The minimum bill provision in each of the tariffs provides that the LNG company can recover certain operating expenses, but not a return on equity, if it is "unable to deliver gas" to the transmission company. LNG supplies from Algeria to the Cove Point facility were cut off in March, 1980, but the two companies who jointly own the plant ("the LNG companies") did not invoke the minimum bill provisions of their tariffs with their affiliated pipeline companies until December, 1980. The Commission, in a series of three opinions, eventually concluded that the LNG companies should have invoked the minimum bill as of May 31, 1980, and ordered the LNG

companies and their affiliated pipelines to refund amounts above the minimum bill charged after that date. *Columbia Gas Transmission Corp.*, 25 F.E.R.C. ¶ 61,460 (1983) [hereinafter cited as Op. 202], *vacated*, 27 F.E.R.C. ¶ 61,089 [hereinafter cited as Op. 202–A], *modified*, 28 F.E.R.C. ¶ 61,053 (1984) [hereinafter cited as Op. 202–B]. We find the Commission's order to be based on substantial evidence and to be a rational exercise of its broad powers to fashion discretionary relief. We therefore deny the petitions for review.

I. THE BACKGROUND

A. *The Minimum Bill Provision*

Petitioners[1] Consolidated System LNG Company ("Consolidated LNG") and Columbia LNG Corporation ("Columbia LNG") jointly own a regasification terminal for LNG at Cove Point, Maryland and a pipeline from the terminal to Loudoun County, Virginia. In 1972, the Federal Power Commission ("FPC" or "Commission") authorized each of the companies to import LNG from Algeria and to revaporize it at Cove Point for transportation and sale to its pipeline affiliate, Columbia Gas Transmission Corporation ("Columbia Transmission") and Consolidated Gas Transmission Corporation ("Consolidated Transmission"), respectively. *Columbia LNG Corp.*, 47 F.P.C. 1624 [hereinafter cited as Op. 622], *modified*, 48 F.P.C. 723 (1972) [hereinafter cited as Op. 622–A].[2] The facility began operating in 1978 with Columbia LNG as the operator.

The Commission certificated the Cove Point facilities pursuant to § 7 of the Natural Gas Act, 15 U.S.C. § 717f (1982), large-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Consolidated Gas Transmission Corporation ("Consolidated Transmission"), Niagara Mohawk Power Corporation, and the Public Service Commission of the State of New York are also petitioners in these consolidated cases. The Maryland People's Counsel, the State of Ohio and Public Utilities Commission of Ohio, and the Columbia Gas Transmission Corporation have filed briefs as intervenors.

2. These FPC opinions also authorized Southern Natural Gas Company to import LNG and regasify it at a facility in Savannah, Georgia. Proceedings concerning Southern Natural Gas' failure to invoke an identical minimum bill provision were severed, Op. 202 at 62,000, and are currently under review by the Eleventh Circuit. Southern Natural Gas Co. v. FERC, No. 84–7563 (11th Cir. filed Aug. 24, 1984).

ly in response to a shortage of natural gas in the United States and on the systems involved. Op. 622 at 1636–37. The import and certificate authorizations provided that El Paso Algeria Corporation would "deliver the equivalent of 650,000 Mcf per day of LNG at Cove Point, 300,000 Mcf for Columbia LNG and 350,000 Mcf for Consolidated LNG." *Id.* at 1637.[3] The regasified LNG would provide base load supplies of gas to the transmission companies estimated at 9.1% of Columbia's and 14.3% of Consolidated's 1977 gas supplies. *Initial Decision,* 47 F.P.C. 1656, 1696–97 (1972) [hereinafter cited as Initial Dec.]. The Commission authorized the imports of LNG pursuant to § 3 of the Natural Gas Act, 15 U.S.C. § 717b (1982), finding the LNG supplies from Algeria to be adequately reliable but recognizing "that there can be no absolute guarantee that there will be no interruption of supply." Op. 622 at 1633.

While the Commission was convinced that the LNG was badly needed by the companies, it warned "that it is [not] in the best interest of gas consumers in the United States that any project which promises new supplies of gas be approved regardless of the associated price and other conditions." Op. 622–A at 727. The Commission acted instead to balance the need to make the project economically viable with its duty to protect gas consumers. *Id.* at 726. It chose the minimum bill as the tariff mechanism by which to create "an equitable apportionment of the risk between customers and stockholders and … to assure the financing of the project on reasonable terms to the consumer." *Id.* at 730.

A minimum bill provision similar to that adopted by the FPC to apportion the project's risk had initially been proposed by Consolidated LNG. Consolidated LNG's proposed tariff provided that the company would not pass on to customers return on equity costs in the event of a service interruption in excess of one day. In return for this assumption of some of the risk of interruption, Consolidated LNG sought a greater return on equity than that granted its pipeline affiliate. Initial Dec. at 1694–95. Columbia LNG, on the other hand, had proposed a tariff providing for the payment of all costs, including a return on equity, " 'regardless of: (i) the amount of gas delivered, and (ii) the non-delivery of gas for any reason, including force majeure,' " and was willing to accept the same return on equity as its pipeline affiliate in return for being allowed to pass the entire risk of interruption on to its customers. *Id.* at 1694. The Commission approved the certificates and most of the proposed tariffs for sales by the LNG companies to their affiliated pipelines but rejected the portions of both tariffs requiring payment whether or not LNG was delivered, finding the provisions contrary to the public interest. Op. 622 at 1639. On rehearing, however, the Commission found that "although full 'cost-of-service' tariffs are not in the public interest, the type of minimum bill proposed by Consolidated LNG is acceptable for this project, and that, in the event of non-delivery, certain fixed costs should be recovered by the LNG companies." Op. 622–A at 730. The Commission therefore ordered that the tariffs filed by both LNG companies include a minimum bill provision specifying the expenses to be paid "[i]n the event that Seller is unable to deliver gas to Buyer during any period exceeding one day." *Id.* at 731.[4]

---

3. Columbia LNG was authorized to import an annual quantity not to exceed 123,187.5 billion Btu and Consolidated LNG an annual quantity not to exceed 143,718.75 billion Btu. Op. 622 at 1648. Natural gas quantities are often measured in thousands of cubic feet (Mcf) or dekatherms (dt). One dekatherm equals one million Btu's and one Mcf of gas contains approximately one million Btu's of energy, so the two measures are rough equivalents.

4. The LNG companies were not, however, allowed a higher rate of return than their pipeline affiliates. Op. 202 at 62,011 n. 23.

The full minimum bill provision provides: In the event that Seller is unable to deliver gas to Buyer during any period exceeding one day, Buyer shall reimburse Seller for all out-of-pocket expenses incurred during such period, limited to the following:
(a) Operating and maintenance expenses;
(b) Taxes payable;

## B. *The Algerian Cut-Off and the FERC Proceedings*

Deliveries of imported LNG to the Cove Point terminal began in 1978. Sonatrach, the Algerian company exporting the LNG, suspended deliveries effective March 31, 1980, after it was unable to secure the Algerian government's approval of an amendment increasing the price paid by El Paso Algeria to Sonatrach. The last shipment of LNG from Algeria was unloaded at Cove Point on April 11, 1980, leaving the storage tanks nearly full with over 5 million dt of gas. Negotiations between representatives of the U.S. and Algerian governments were held in an attempt to resolve the pricing dispute; the negotiations began on April 21, 1980 and continued into 1982, but to no avail.

The LNG companies decided to husband the remaining LNG supplies in the Cove Point facility in order to keep the facility in a cryogenic condition, which would allow the terminal to receive new LNG deliveries without the expense and delay of recooling the facility.[5] The companies also wanted to avoid sending signals that would adversely affect the ongoing negotiations. Average daily send-out volumes were reduced from the pre-embargo level of 435,-000 dekatherms per day (dt/day) in March, 1980 to 86,000 dt/day in April. Deliveries fell to 166,000 dt on April 1, 62% below the March, 1980 daily average. In May, send-out volumes were further reduced to "boil-off" levels and remained at those levels, with two exceptions, into December.[6] By

December 4, 1980, the LNG stored at Cove Point had risen in Btu content to the point where it could not be blended with the pipelines' other gas. The LNG companies therefore began the process of revaporizing the LNG remaining in storage, a process which took from December 5 to December 10 to complete. On December 11, 1980, Columbia LNG and Consolidated LNG began billing under their minimum bill provisions.

On May 23, 1980, meanwhile, Columbia Transmission had filed a rate reduction in its purchased gas adjustment in order to flow through to customers its savings from purchasing gas at lower prices than those for the LNG it had been receiving from Cove Point. The Maryland People's Counsel and Public Service Commission of the State of New York sought to intervene in the proceeding, arguing that the filing reflected excessive rates due to Columbia Transmission's continuing payments to Columbia LNG under the cost-of-service tariff, rather than under the minimum bill provision. FERC granted the requests to intervene and, on its own motion, ordered an investigation which also encompassed the similar minimum bill provisions in the tariffs of Consolidated LNG and Southern Natural Gas. J.A. at 269–71; *see also supra* note 2.

The Administrative Law Judge ("ALJ") issued an initial decision finding that each LNG company had complied with its minimum bill provision. *Columbia Gas Transmission Corp.*, 18 F.E.R.C. ¶ 63,060 (1982)

---

(c) Interest expense based on that portion of Seller's then existing debt which was incurred for the construction of the LNG and related facilities;

(d) The requirements for repayment of such debt; and

(e) Amounts, if any, Seller shall be obligated to pay suppliers arising from Buyer's failure to accept deliveries from Seller.

Provided, however, that Buyer's obligation to pay shall not extend beyond the time at which Seller, if it is the party claiming *force majeure*, could have remedied the cause in an adequate manner with all reasonable dispatch in order to resume deliveries to Buyer.

Op. 622–A at 731; *see also* Joint Appendix ("J.A.") at 74–75, 208–09.

**5.** To remain in a liquid state, natural gas must be maintained in a cryogenic condition at minus 260°F. FERC's initial opinion noted that once the plant is emptied, cool down procedures would require a lead time of seven to nine weeks and cost approximately $500,000. Op. 202 at 62,011 n. 21.

**6.** "Boil-off" is the amount of LNG that vaporizes as a result of normal heat leaks in the system. For two brief periods, June 2–18 and October 1–12, deliveries in quantities greater than boil-off were made because the LNG had risen in Btu content to the point where it exceeded pipeline standards.

[hereinafter cited as ALJ Op.]. The ALJ, conceding that "it may be simplistic to conclude that 'unable to deliver gas' means precisely what it states," ALJ Op. at 65,-190, found the phrase to be "clear and unambiguous," *id.* at 65,191. Because the triggering condition in the minimum bill was the Seller's *inability* to deliver gas, and because each LNG company had the *ability* to deliver gas in significant quantities up to December, 1980, the ALJ upheld the LNG companies' actions. *Id.* at 65,190–91.[7]

In its first opinion, the Commission concurred with the ALJ's plain meaning interpretation of the phrase "unable to deliver gas." FERC found "that the phrase is so simple that it defines ambiguity ... and that to construe [unable] in a way other than consistent with its plain meaning would be inconsistent with both standard usage of the English language and the canons of document construction." Op. 202 at 62,005. The Commission, however, found that the pipeline companies had acted imprudently by failing to demand deliveries at the usual levels from the LNG companies. *Id.* at 62,008–09. The pipeline companies were therefore ordered to refund the difference between the amounts paid under the cost-of-service tariff and the amounts that would have been paid under the minimum bill for the period from April 24 to December 10, 1980. *Id.* at 62,009. The April 24 date was based on stipulations by the parties that if shipments had continued at the level of average daily deliveries during March, 1980, all of the LNG would have been delivered to the transmission companies as of April 23, 1980. *Id.* at 62,009; J.A. at 61,189.

FERC granted rehearing of Opinion 202 in response to several petitions, and vacated substantially all of the opinion. Op. 202–A at 61,166. In Opinion 202–A, the Commission found a substantial basis for the existence of ambiguity in the minimum bill provision and consequently considered extrinsic evidence in interpreting the phrase "unable to deliver gas." FERC concluded that the language was intended to require "gas deliveries to the pipelines at approximately the certificated levels ... to forestall invocation of the minimum bill." *Id.* at 61,168. The Commission rejected the ALJ's interpretation focusing solely on the LNG companies' ability to deliver because it allowed them "to decide in their own self-interest that the customers and ratepayers would continue to pay the full cost-of-service for the Cove Point LNG terminal even though they were not receiving the benefit of the base load supply of gas they were supposed to receive." *Id.*

FERC then held that the minimum bill should have been invoked on June 30, 1980, basing its conclusion on three findings. The Commission first found that "it become evident in early May 1980 that the embargo would continue indefinitely and that there was therefore no valid reason to keep the Cove Point terminal in its cryogenic condition any longer." *Id.* at 61,169 (footnote omitted). Early May was also found to be a valid starting point for the analysis because "base load deliveries within the broad parameters of historical deliveries were being made" into early May. *Id.* Finally, FERC found that the LNG companies would have needed a period of "6 to 7 weeks to accomplish the technical procedures required to empty the LNG from the terminal." *Id.* Counting this period from early May, the Commission arrived at a refund date of June 30.

Again, various parties and intervenors petitioned for rehearing and again FERC issued an opinion, this time modifying only its findings as to the refund date. The Commission reaffirmed its finding that the companies should be allowed eight weeks[8]

---

7. The ALJ found that "[e]ach Cove Point LNG company had ... the *ability* to deliver gas in significant, even 'base load' quantities, every day in question and this ability continued ... until the LNG inventory no longer exist[ed]." ALJ Op. at 65,191.

8. Although FERC stated that it was using a six to seven week shutdown period in Opinion 202–A, Opinion 202–B characterized the June 30 date in the previous opinion as "includ[ing] an allowance by the Commission of eight weeks for purposes of developing procedures for plant

to develop procedures for plant shutdown, Op. 202–B at 61,096, but held that the eight weeks were to be counted from the "striking drop" in deliveries that occurred on April 1, *id.* at 61,098. The Commission concluded that its finding in Opinion 202–A as to the validity of the husbanding program was "the wrong premise on which to base the decision." *Id.* at 61,097. Focusing solely on delivery levels, FERC first distinguished diminished daily delivery levels prior to the Algerian embargo from those that followed it, concluding that the only five brief periods of lowered deliveries prior to the embargo differed from the post cut-off period because "there was no question but that LNG was coming and would continue to come into the facility for the immediate future and that gas produced therefrom would be sent to system customers at normal levels in fairly short order." *Id.* at 61,098. In looking at the delivery levels after the embargo, the Commission reversed its finding that base load deliveries had continued into early May, *id.* at 61,097, and instead concluded that the dramatic drop in deliveries which occurred on April 1 was "the first change which signifies the decision to husband the LNG and, as such, is the most appropriate for constructuring the refund date," *id.* at 61,099.

These petitions for review followed.[9]

## II. THE LEGALITY OF THE COMMISSION'S DECISION

 FERC's ultimate interpretation of the minimum bill provision rests on two findings: that the provision is ambiguous and that the LNG companies are "unable to deliver gas" when deliveries fall below "base load deliveries within the broad parameters of historical deliveries" and will not resume at those levels "in fairly short

order." Based on these two premises, the Commission concluded that the minimum bill should have been invoked by both LNG companies on May 31, 1980. In reviewing this tariff interpretation, we must "accord appropriate deference, though not of course conclusive validity, to the judgment of the expert agency that deals with such contracts regularly." *Papago Tribal Utility Authority v. FERC,* 723 F.2d 950, 953 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). FERC's order, like all Commission orders under the Natural Gas Act, is to be accorded a presumption of validity. *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). After reviewing the opinions and the record to "assur[e] that the Commission's decisionmaking is reasoned, principled, and based upon the record," *Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578, 593 (D.C.Cir.1979), we affirm FERC's interpretation of the tariff.

### A. *Ambiguity of the Minimum Bill*

 Whether the minimum bill provision is ambiguous is a matter of law for this court to decide. *Clayman v. Goodman Properties, Inc.,* 518 F.2d 1026, 1034 (D.C.Cir.1973). A tariff or contract "is ambiguous when it is 'reasonably susceptible of different constructions or interpretations.'" *Lee v. Flintkote Co.,* 593 F.2d 1275, 1282 (D.C.Cir.1979) (footnote omitted). If a contract is not ambiguous, extrinsic evidence cannot be used as an aid to interpretation. *Id.* at 1281 (quoting *Clayman v. Goodman Properties, Inc.,* 518 F.2d 1026, 1034 (D.C.Cir.1973)).

The LNG companies argue that the tariff is not ambiguous and so its plain meaning

---

shutdown." Op. 202–B at 61,096. The ambiguity arises because the record evidence on which FERC based the shutdown allowance was testimony that procedures for emptying the plant would have taken until the end of May to design and implement if planning had begun after the last shipment of gas to Cove Point on April 11. *See* Op. 202–A at 61,171 n. 29; J.A. at 16. FERC's range of six to seven or eight weeks is not unreasonable given this evidence, and the

Commission was consistent in Opinion 202–B in characterizing the shutdown period as eight weeks. *See* Op. 202–B at 61,096, 61,099. We therefore accept FERC's choice of eight weeks as the proper length for the shutdown period.

**9.** Arguments raised in this appeal that are not expressly addressed have been considered and determined to be without merit.

controls. The plain meaning put forth by the LNG companies and adopted by the ALJ is that the minimum bill is triggered by the *inability* to deliver gas. Under this interpretation, the minimum bill need never have been triggered because the Cove Point terminal was full of LNG which the companies were *able* to deliver even though they chose *not* to make deliveries in more than boil-off quantities. ALJ Op. at 65,190–91. FERC rejected this interpretation as placing total control over the triggering of the minimum bill into the hands of the LNG companies, frustrating the provision's purpose as a mechanism of risk allocation between the customers and the companies. Op. 202–A at 61,168. Instead, FERC found the "unable to deliver gas" language to be ambiguous.

■ FERC's analysis is properly the starting point for our assessment of the minimum bill language. In determining whether the minimum bill provision is ambiguous, we accord FERC's finding of ambiguity "the same degree of deference ... as we accord it with regard to the ultimate question of the meaning of the contract." *Papago*, 723 F.2d at 955. In Opinion 202–A the Commission concluded that the phrase "unable to deliver gas" was ambiguous, citing three reasons. First, after looking to other portions of the tariff establishing contract demand levels, FERC found that the word "gas" was "susceptible of differing interpretations as to what was intended with respect to quantity." Op. 202–A at 61,166. Second, FERC considered the purpose of the tariff when proposed—certificating a base load facility in response to a gas shortage—in light of changed circumstances which might make the tariff ambiguous as applied. Finally, FERC considered Columbia LNG's prior conduct in invoking the minimum bill after

an explosion at the terminal in 1979. *Id.* at 61,167.

■ FERC properly looked at portions of the tariff other than the minimum bill, including the service agreements, in assessing the ambiguity of the word "gas" in the phrase "unable to deliver gas." In construing tariffs, courts and agencies must look to the four corners of the tariff and consider the entire instrument as a whole. *United States v. Missouri-Kansas-Texas Railroad*, 194 F.2d 777, 778 (5th Cir.1952). In light of anticipated daily delivery levels in the tariff of at least 300,000 Mcf/day,[10] FERC properly found that the word "gas" implicitly intended some quanitity of gas, but was susceptible of different interpretations as to how much.

■ FERC also discerned ambiguity in the minimum bill provision when it examined the original purposes underlying the tariff in light of changed circumstances. The purposes for which a tariff was imposed should be considered when interpreting the tariff, for "to decide the question of the scope of [a] tariff without consideration of the factors and purposes underlying the terminology employed would make the process of adjudication little more than an exercise in semantics." *United States v. Western Pacific Railroad*, 352 U.S. 59, 67, 77 S.Ct. 161, 167, 1 L.Ed.2d 126 (1956). In addition, in interpreting contracts and tariffs, "extrinsic evidence is admissible to remove and explain any ambiguity in the contract as applied. Ambiguity easily arises when the contract is applied to its subject matter in changed circumstances." *Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir.1981) (citation omitted). The Cove Point terminal had been certificated as a base load facility in response to a severe

---

**10.** The LNG companies correctly point out that the tariffs do not explicitly specify daily contract demand levels, only an annual maximum delivery amount. The service agreements, however, provide for sales of LNG pursuant to the FPC's authorization in CP 71–68, J.A. at 95, 211, which is the docket that resulted in Opinion 622. That opinion refers to delivery levels of 300,000 Mcf per day for Columbia and 350,000 Mcf per

day for Consolidated. Op. 622 at 1637. Thus, the FPC clearly contemplated that the certificated annual maximum delivery levels would be spread relatively evenly over the year. Their expectation is reinforced by the Columbia tariff, which provides that "[d]eliveries shall be made at uniform daily and hourly rates to the extent practicable." J.A. at 75.

**1546**

shortage of natural gas, Op. 622 at 1636–37, and FERC properly concluded that ambiguity arose in applying tariffs drafted for such a facility when circumstances had changed and the terminal was no longer supplying base load quantities of gas.[11]

■ FERC also based its finding of ambiguity on "the prior conduct of a party . . . arguably inconsistent with that party's present interpretation of the same language." Op. 202–A at 61,167. Following an explosion at Cove Point in 1979, Columbia LNG invoked its minimum bill provision although small amounts of gas were delivered to Columbia Transmission. (Consolidated LNG invoked the provision only when no deliveries were made.) A Columbia vice president stated in testimony before the Economic Regulatory Administration that the provision had been invoked " 'when the plant was not capable of sending out *significant* quantities of gas.' " *Id.; see* J.A. at 261. FERC's use of this prior conduct is questionable, however, for two reasons. First, prior inconsistent actions by Columbia LNG should not necessarily affect the interpretation of Consolidated LNG's tariff if Consolidated has always acted consistently with its current interpretation. Second, the parties' interpretations may be irrelevant if the language was drafted by the Commission rather than by the parties.[12]

We need not decide whether Columbia LNG's prior conduct can be used as a basis for finding the contract to be ambiguous, however. Other language within the four corners of the tariff, the purposes of the tariff and minimum bill provisions, and changed circumstances suffice to support the Commission's conclusion that the language of the minimum bill provision is ambiguous.

**B.** *Interpretation of the Minimum Bill Provision*

■ Once a contract or tariff is found to be ambiguous, "extrinsic evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pennzoil,* 645 F.2d at 388. The Commission considered several extrinsic factors in interpreting the ambiguous phrase "unable to deliver gas," including the earlier opinions certificating the LNG terminal and the surrounding factual context.[13] Op. 202–A at 61,167. Based on this evidence, FERC concluded that the minimum bill provision had to be invoked whenever the LNG companies failed to make "base load deliveries within the broad parameters of historical deliveries," *id.* at 61,069, for more than a few days when gas deliveries would not resume "at normal levels in fairly short order," Op. 202–B at 61,097–98.[14]

11. FERC's opinion can be read to refer to either an end to the gas shortage or the cessation of base load operation at Cove Point as the changed circumstances which create ambiguity. *See* Op. 202–A at 61,167. In later portions of the opinion interpreting and applying the minimum bill, however, the Commission clearly focuses on the operational change away from being a base load facility. *See id.* at 61,167–69; Op. 202–B at 61,099. We therefore read FERC's invocation of changed circumstances to refer to the cessation of base load operation at Cove Point.

12. It is unclear from the record before us whether the FPC or Consolidated drafted the minimum bill provision. Consolidated originally filed a version of a minimum bill, Initial Dec. at 1694, and the FPC eventually adopted "the type of minimum bill proposed by Consolidated LNG," Op. 622–A at 730. The first of FERC's three decisions in the current proceeding said

that the minimum bill provision the FPC adopted "was that originally proposed by Consolidated LNG," Op. 202 at 62,002, but later remarked that "how the parties may in the past have interpreted the tariff language is likewise immaterial because it was not their language they were interpreting—it was the FPC's language," *id.* at 62,005. This finding was vacated in Opinion 202–A, but the Commission gave no reason for its conclusion that the parties' interpretation was now material.

13. The Commission also considered Columbia LNG's interpretation of the minimum bill, a factor we do not consider for the reasons stated previously in text.

14. The Commission's initial use of language about "certificated levels," Op. 202–A at 61,168, rather than the more accurate focus on base load levels, is somewhat confusing. The Cove Point facility never seems to have sent out deliv-

The key to interpreting the minimum bill provision is an understanding of the reasons why the FPC required the provision in the tariff as a condition of the certificate of public convenience and necessity for the Cove Point terminal. In interpreting a contract or tariff, "the court looks to the language of the contract and its commercial (or in this case, regulatory) context." *Pennzoil*, 645 F.2d at 388. FERC properly based its interpretation of "unable to deliver gas" on the two primary purposes underlying the minimum bill provision: certificating a base load facility and allocating costs in the event of non-delivery.

First, as FERC noted, "the whole purpose of the LNG importation projects and the FPC's approval of them was to provide substantial, base load supplies of gas at a time when conventional gas supplies were very short." Op. 202–A at 61,167. Despite the absence of daily contract demand levels in the service agreements, *see supra* note 10, the regasification facility was unquestionably certificated as a base load unit. Initial Dec. at 1696; Op. 622–A at 725; *see also Columbia LNG Corp.*, 57 F.P.C. 354, 365 (1977). The tariffs and service agreements reflect the base load nature of the Cove Point facility, providing for large annual contract quantities and for firm service not subject to interruption or curtailment. J.A. at 72, 95, 197, 211. The terminal was not, however, supplying base load quantities to the pipeline companies for much of the period following the embargo, a changed circumstance which created ambiguity when the language of the minimum bill provision was applied. FERC's interpretation of "unable to deliver gas" resolved this ambiguity and reflected the base load nature of the Cove Point Facility by linking invocation of the minimum bill to an end to base load deliveries, as indicated by significant decreases in deliveries for

eries at the certificated levels of 350,000 Mcf for Consolidated and 300,000 Mcf for Columbia. *See* Op. 622 at 1637; J.A. at 98–101, 222–25. In constructing the refund date, however, FERC properly focused on normal or base load deliveries. Op. 202–A at 61,168–69; Op. 202–B at

more than a minimal period of time with no resumption forseeable in fairly short order.

The Commission also relied on the risk allocation purpose of the minimum bill provision in interpreting the tariff. The ALJ recognized at the start that the Cove Point facility involved "an additional risk because of the possibility of a supply interruption, which would be peculiarly applicable to the source of supply in the instant proceedings." Initial Dec. at 1695. The Commission required insertion of the minimum bill provision "as an equitable apportionment of the risk between customers and stockholders and in order to assure the financing of the project on reasonable terms to the consumer." Op. 622–A at 730.

Allocating risks is not, however, the same as allocating blame. FERC's first opinion improperly focused on the prudence of the transmission companies' actions, Op. 202 at 62,008, as the Commission later realized, Op. 202–A at 61,166 ("the question of prudence (of either the pipelines or their LNG affiliates) is ... immaterial in these proceedings"). Similarly unavailing are the LNG companies' arguments that the husbanding program was prudent or that it is not inherently unreasonable for them to earn a return on their investment except when they are literally "unable to deliver gas." As this court noted recently,

"At bottom [the company's] claim is that because it acted prudently, it cannot fairly be punished by non-recovery of its expenses. But the problem of risk allocation in this case is not a problem of fault.... The Natural Gas Act simply does not guarantee the shareholders of even a prudently managed utility that ratepayers can always be stuck with the bill for supply projects that turn out to be total failures...."

61,099. Commissioner Richard's concurring opinion probably best states the question to be asked in interpreting the minimum bill provision: "at what point was the project as a source of *base load supply* no longer viable?" Op. 202–A at 61,172.

*Natural Gas Pipeline Company of America v. FERC,* 765 F.2d 1155, 1163–64 (D.C. Cir.1985).

FERC's interpretation of the minimum bill accurately reflects the allocation of risk established by the FPC in 1972. The Commission designed the conditions on the certificate to ensure that "ratepayers will not have to sustain the economic burden of projects that are not economically viable.... Our objective is, and must be, to protect the ultimate consumer." Op. 622 at 1640. When the FPC subsequently modified the tariffs and added the minimum bill, it reaffirmed that the changes were designed "to make the project economically viable while at the same time preserving those conditions which we find to be essential for the protection of the consumers of gas in the United States." Op. 622–A at 725. The FERC interpretation rightly protects consumers from bearing all the risks of a project that, since the Algerian cut-off, has not been serving as an economically viable base load facility.

The minimum bill was designed to allocate the risks of the LNG project and to protect gas consumers from paying a return on equity when the facility was not supplying base load quantities of gas. FERC's interpretation of the phrase "unable to deliver gas" reflects this purpose and is hereby affirmed.[15]

### C. *Construction of the Refund Date*

■■■■ The Commission's reasoning was at its most mercurial in the selection of a refund date. The three opinions specified three different dates: April 24,[16] June 30,

and May 31. FERC's final choice of a refund date was, however, a product of reasoned decisionmaking, not an "unprincipled about-face to reach a predetermined result." *See* Consolidated Brief at 17. As FERC correctly points out, "a number of different dates could have been selected by the Commission, all subject to some weaknesses. There is no clearly correct date upon which the LNG companies should have invoked their minimum bill provisions." FERC Brief at 32. The Supreme Court has acknowledged that such a problem can occur and held that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citations omitted). We find the choice of May 31 as the date on which the minimum bill should have been invoked to be supported by substantial evidence.

The May 31 refund date is based on two conclusions. The first is that April 1 was the date on which "the LNG companies recognized the supply cessation by reducing their delivery volumes substantially." Op. 202–B at 61,099. The second is that "the LNG companies would need a six to eight week period to plan and implement shutdown procedures and deplete the remaining LNG entirely." *Id.*

The April 1 date is consistent with the Commission's interpretation of the minimum bill provision and is based on substan-

---

**15.** In interpreting the ambiguous minimum bill provision, FERC also noted, almost as an afterthought, that the service agreements are output contracts under which "there is no delivery when quantities unreasonably disproportionate to contract demand levels are tendered." Op. 202–A at 61,168 (footnote omitted). This court has held, however, that § 2–306(1) of the Uniform Commercial Code, to which FERC referred, "does not preclude *good faith reductions* that are highly disproportionate to normal prior requirements." *R.A. Weaver & Assocs. v. FERC,* 587 F.2d 1315, 1322 (D.C.Cir.1978). Because FERC did not find that the reductions were made in bad faith—and because we have decid-

ed that interpretation of the minimum bill should not turn on the prudence or good faith nature of the companies' actions—the output contract interpretation of the tariff in this case cannot be supported.

**16.** The reasoning behind the April 24 date is different from that used to support the latter two dates, however, because FERC was deciding on what date the minimum bill would have been invoked had the pipeline companies demanded deliveries at pre-embargo contract demand levels. Op. 202 at 62,009; *see also infra* at p. 1549.

tial evidence in the record. The LNG companies argue that the April 1 date is an unreasonable benchmark because it is based on an implicit finding by FERC that the decision to husband the LNG as of that date was not prudent. Such a finding, they argue, is not reasonable or based on substantial evidence because as of April 1 the last shipment of LNG had not yet arrived and United States-Algerian negotiations had not yet begun. FERC, however, explicitly disavowed reliance on whether or when the LNG companies knew that the embargo would continue indefinitely. Op. 202–B at 61,097. FERC's decision to focus on decreases in deliveries after which normal deliveries would not resume "in fairly short order" was designed to exclude variations in deliveries lasting only a few days, Op. 202–B at 61,098, not to re-introduce the issue of the companies' subjective expectations as to the length of the service disruption. The April 1 date was chosen because it marked the point at which the companies' actions created a "significant drop" in deliveries such that "base load deliveries 'within the broad parameters of historic deliveries'" were no longer being made. *Id.* at 61,098–99. The record supports the finding that April 1 was the beginning of the husbanding program, J.A. at 103–04, and therefore the end of base load operation at the Cove Point terminal.

FERC found that an eight week period following April 1 would have been necessary to allow the LNG companies to develop and implement "new technical procedures for emptying and de-cooling the terminal in an orderly, but not unreasonably attenuated, manner." Op. 202–A at 61,169. This finding was based on testimony by a Columbia LNG witness that the earliest date by which all the LNG could have been sent out from the Cove Point terminal was the end of May. Mr. Max Levy, a senior vice president, explained that "[w]e had no procedures to rid the offshore piping of LNG. We had never envisioned a need to do that. So we would have had to have developed procedures...." J.A. at 16. Intervenors argue that FERC should not have allowed for this shutdown period because the LNG companies would have had procedures in place if they had acted prudently, in which case deliveries could have continued at the same level and the LNG tanks would have been empty by April 24, as stipulated. J.A. at 61,189.

■ Like Commissioner Richard, we believe that FERC's decision to allow an eight week shutdown period was a "close call." Op. 202–A at 61,172 (Comm'r Richard concurring). In reviewing FERC's choice of a refund date, however, we must remember that "[b]y giving the agency discretionary power to fashion remedies, Congress places a premium on agency expertise." *Consolo,* 383 U.S. at 621, 86 S.Ct. at 1027. Our standard of review for FERC's relief orders "is highly deferential [because] '[t]he breadth of agency discretion is, if anything, at its zenith when the action assailed relates ... to the fashioning of policies, remedies and sanctions.'" *Columbia Gas Transmission Corp. v. FERC,* 750 F.2d 105, 109 (D.C.Cir.1984) (quoting *Niagara Mohawk Power Corp. v. FPC,* 379 F.2d 153, 159 (D.C.Cir.1967)). If the Cove Point terminal had been operating as a base load facility, it would not necessarily cease to so operate when the time came to shut down. Had the embargo never occurred, the terminal would have shut down at some point in the future and under a reasonable interpretation of the minimum bill provision the LNG companies could have billed under the cost-of-service tariff until the final day of operation. The intervenors' arguments that the shutdown could have taken place faster had plans been in place goes to the prudence of the LNG companies' actions, an issue we and FERC have found to be irrelevant to the interpretation of the minimum bill. *See supra* at pp. 1547–48. FERC's use of the eight week period is a rational decision based on record evidence and is therefore affirmed.

Several parties argue that the minimum bill should have been invoked on April 24, based on the parties' stipulation that the LNG in storage at Cove Point would have been exhausted on April 23 had deliveries continued at the average daily delivery lev-

el for March, 1980. J.A. at 61,189. The calculation in this stipulation, however, is based on a stricter interpretation of the minimum bill than that adopted by FERC because it effectively bars any variations from historical levels. Under FERC's interpretation, the minimum bill is triggered by deliveries falling below the broad parameters of historical deliveries without resuming at normal levels in fairly short order. FERC properly rejected the refund date based on the stipulation and other contrary constructions of the refund date. We affirm the Commission's selection of the May 31 refund date as a rational exercise of its broad remedial powers.

### D. *Authority to Order Refunds*

■ The LNG companies argue that FERC lacked the statutory authority to order the refunds in this case. The companies correctly point out that remedies ordered pursuant to § 4(a) of the Natural Gas Act, 15 U.S.C. § 717c(a) (1982), after a finding that a rate is illegal, can only be prospective. *Public Service Co. v. FERC*, 600 F.2d 944, 957–58 (D.C.Cir.), *cert. denied*, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979). The companies are also correct in noting that they filed no rate increase pursuant to § 4(e), 15 U.S.C. § 717c(e) (1982), which the Commission suspended so it could subsequently order refunds. Neither of these provisions, however, was relied on by the Commission in this case.[17]

FERC was interpreting a tariff provision imposed to condition a certificate of public convenience and necessity issued pursuant to § 7 of the Natural Gas Act, 15 U.S.C. § 717f(c), (e) (1982), and its refund order was designed to enforce that condition.[18] We hold that FERC has the authority under § 16 of the Natural Gas Act to order retroactive refunds to enforce conditions in certificates. That section gives the Commission authority "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this chapter." 15 U.S.C. § 717o (1982). While the proper interpretation of the breadth of FERC's remedial powers under § 16 has been disputed, all of the cases are in agreement that the section, at a minimum, gives the Commission authority to remedy violations of other substantive sections of the Natural Gas Act.

■ This court recently evaluated FERC's remedial authority under the Natural Gas Act and concluded that "[t]he principle fairly drawn from prior cases is that the Commission has broad authority to fashion remedies so as to do equity consistent with the public interest." *Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 109 (D.C.Cir.1984). In construing a provision of the Federal Power Act analagous to § 16, this court has held that "such

---

**17.** The LNG companies mischaracterize FERC's brief and claim that the Commission is relying on § 4(a), when the brief simply states that if the *companies'* interpretation of the minimum bill provision were to be followed, the tariff would be unlawful under § 4(a). FERC Brief at 27.

**18.** The Commission did not clearly state what provision of the Natural Gas Act it relied upon in ordering refunds, simply stating in a footnote that "[s]ince we have found th[a]t the LNG affiliates violated the terms of their tariffs beginning July 1, 1980, refunds from that date may be ordered." Op. 202–A at 61,171 n. 31. On closer examination, it is clear that FERC acted pursuant to its certificating authority under § 7. The initial order establishing the investigation was based on alleged violations of several sections of the Natural Gas Act, including § 7. J.A. at

269–71. The investigation was ordered pursuant to both sections 4 and 14 of the Act, *id.*, and the latter section authorizes investigations as to violations of any section of the Act, 15 U.S.C. § 717m (1982). Finally, FERC's opinions emphasized the nature of the tariff as a condition attached to a certificate of public convenience and necessity. We therefore conclude that FERC was acting pursuant to its § 7 certificating authority, realizing that "[w]hile we may not supply a reasoned basis for the agency's action that the agency has not given, we will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974) (citations omitted).

'necessary or appropriate' provisions ... authorize an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act." *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 158 (D.C.Cir.1967). Section 16 is not, however, an unrestricted grant of authority: it "merely augment[s] existing powers conferred upon the agency by Congress, [but] do[es] not confer independent authority to act." *New England Power Co. v. FPC*, 467 F.2d 425, 430–31 (D.C.Cir.1972) (footnote omitted), *aff'd*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). Thus, this court has held that the FPC was not authorized by § 16 to alter its procedures for setting rates because that section "cannot enlarge the choice of permissible procedures beyond those that may fairly be implied from the substantive sections and the functions there defined." *Mobil Oil Corp. v. FPC*, 483 F.2d 1238, 1257 (D.C.Cir.1973).

Our precedents and those of other circuits have been read inconsistently, however, in previous attempts to define the scope of Commission authority under § 16. While all the cases reach the same conclusion—that § 16 at least gives the Commission remedial authority when it has acted pursuant to other substantive sections of the Natural Gas Act—these courts fail to recognize that consistency. In *Mesa Petroleum Co. v. FPC*, 441 F.2d 182 (5th Cir. 1971), the Fifth Circuit relied heavily on *Niagara Mohawk* in concluding that § 16 provided enough authority for the Commission to carry out its duties of certification under § 7 and correct a company's failure to comply with the certificate provisions of the Natural Gas Act. *Id.* at 186–89. The court went further, however, and implied that § 16 created authority even when no other specific section of the Act is involved. *Id.* at 188. The Third Circuit gave *Mesa* this broader reading in *Gulf Oil Corp. v. FPC*, 563 F.2d 588 (3d Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978), found the positions taken by *Mesa* and *Mobil Oil* to be irreconcilable, and staked out an intermediate position

that § 16 "at least gives the Commission power to take reasonable, temporary measures to assure compliance with its orders." *Id.* at 607–08. The court upheld a retroactive refund order as "an efficient, fair, and reasonable exercise of discretion to compel compliance with section 7(c) of the Natural Gas Act." *Id.* at 607.

These cases present no dispute as to FERC's authority under § 16 to act to remedy violations of other substantive provisions of the Natural Gas Act. We therefore find that FERC had the authority in this case, pursuant to sections 7 and 16 of the Natural Gas Act, to order retroactive refunds when a gas company had improperly collected money under a tariff which conditions a certificate of public convenience and necessity.

### CONCLUSION

The Commission properly interpreted the phrase "unable to deliver gas" in the minimum bill provision at issue in this case. The tariff is ambiguous and FERC's interpretation and refund order are based on substantial evidence and are reasonable exercises of the Commission's discretion. The petitions for review are accordingly

*Denied.*