# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 21, 2010       Decided December 10, 2010

No. 09-1213

TRANSMISSION AGENCY OF NORTHERN CALIFORNIA,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CITY OF REDDING, CALIFORNIA, ET AL.,
INTERVENORS

Consolidated with Nos. 09-1216, 09-1217,
09-1245, 09-1246, 09-1247

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

*Michael Postar* and *Harvey L. Reiter* argued the cause for petitioners. With them on the briefs were *Bhaveeta K. Mody*, *Jon R. Stickman*, *Abigail Briggerman*, *Sean M. Neal*, *John McCaffrey*, *Peter J. Scanlon*, and *Jason T. Gray*. *Lisa S. Gast*, *Matthew R. Rudolphi*, and *Marie D. Zosa* entered appearances.

*Joseph B. Nelson*, *Deborah A. Swanstrom*, and *Lodie D. White* were on the briefs for intervenors Imperial Irrigation District and City of Los Angeles Department of Water and Power in support of petitioners.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Thomas R. Sheets*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Daniel J. Shonkwiler* argued the cause for intervenors California Independent System Operator Corporation and Southern California Edison Company in support of respondent. With him on the brief were *Nancy J. Saracino*, *Roger E. Collanton*, *Jennifer R. Hasbrouck*, *Erin K. Moore*, and *Mark R. Huffman*. *Erin K. Moore* and *Mark D. Patrizio* entered appearances.

Before: GINSBURG, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Various municipalities[1] petition for review of two Federal Energy Regulatory Commission orders conditionally approving the California Independent System Operator ("CAISO")'s proposal to create an Integrated Balancing Authority Area ("IBAA") by combining the Sacramento Municipal Utility District ("SMUD") and the Turlock Irrigation District ("Turlock") for the purpose of pricing transactions. We deny the petitions for review.

## I.

The court has recently summarized much of the pertinent background in *Sacramento Municipal Utility District v. FERC*, 616 F.3d 520, 523-24 (D.C. Cir. 2010), a related case. Following the Commission's promulgation of Order No. 888, which called for nationwide deregulation of electricity transmission and encouraged public utilities to participate in regional transmission organizations and independent system operators, the California legislature in 1996 created the CAISO to operate transmission and other ancillary services on parts of the California electric power system. In response to the 2000 California energy crisis, the CAISO, at the Commission's behest, began redesigning the California electricity market to foster greater reliability and

---

[1] Petitioners are the Sacramento Municipal Utility District, the Turlock Irrigation District, the Modesto Irrigation District, the City of Redding, the City of Santa Clara d/b/a Silicon Valley Power, and the Transmission Agency of Northern California ("TANC"), a joint exercise of powers agency partially comprised of the other petitioners. Petitioners are considered "municipalities" under the Federal Power Act, *see* 16 U.S.C. § 796(7). This is also true for municipal intervenors ("Municipals"), such as the Imperial Irrigation District and the City of Los Angeles Department of Water and Power. For ease of reference, the opinion does not identify individual parties.

economic efficiency on its system.[2] In 2008, the CAISO filed proposed revisions to its existing tariff and the Market Redesign and Technology Upgrade Tariff, which it described as "a comprehensive redesign of the California electricity markets . . . aimed at enhancing reliability and increasing the efficient utilization of the CAISO Controlled Grid." CAISO, Amendments to MRTU Tariff Provisions, at 1, Docket No. ER08-1113-000 (June 17, 2008) ("IBAA Proposal"). The amended tariff would: (1) implement locational marginal pricing[3]; (2) implement a full network model of the transmission system to improve dispatch efficiency; (3) include day-ahead and real-time energy markets; and (4) ensure that day-ahead schedules are physically feasible. The Commission has approved the market redesign in a series of orders, two of which concern the CAISO's IBAA Proposal and are challenged here. *Order Conditionally Accepting Tariff Changes and Directing Compliance Filing*, 124 FERC ¶ 61,271 (Sept. 19, 2008) ("Order"); *Order on Rehearing and Clarification*, 128 FERC ¶ 61,103 (July 30, 2009) ("Rehearing Order").

---

[2] "An [Independent System Operator ("ISO")] is an independent company that has operational control, but not ownership, of the transmission facilities owned by member utilities. ISOs provide open access to the regional transmission system to all electricity generators at rates established in a single, unbundled, grid-wide tariff . . . ." *NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n*, 130 S. Ct. 693, 697 n.1 (2010) (ellipsis in original) (citation and internal quotation marks omitted).

[3] Under a locational marginal price rate design, energy prices vary by location and time in order to reflect the cost of energy, including the cost of transmission losses and congestion, at each location on the CAISO-controlled grid. *Sacramento Mun.*, 616 F.3d at 524-25. As such, "prices are designed to reflect the least-cost of meeting an incremental megawatt-hour of demand at each location on the grid." *Id.* at 524.

According to the CAISO, the "most important objective" of its proposal was to "protect CAISO ratepayers from unjust and unreasonable prices that may result in the absence of the CAISO having accurate information . . . to verify the location of external resources." IBAA Proposal at 2. The CAISO's inability to verify the location of external resources stemmed from California's and the Pacific Northwest's electricity transmission infrastructure. The California-Oregon Intertie, which delivers electricity from the Pacific Northwest to central California, is comprised of three 500 kilovolt power lines that run parallel to each other. The first line, the California-Oregon Transmission Project ("COTP"), runs from the Captain Jack substation in Oregon to the Tesla substation in central California, ending at the Olinda substation. TANC is a participant in, and the project manager of, the COTP. The COTP is generally located within the SMUD balancing authority area and is not part of the CAISO-controlled grid. The remaining two lines, known collectively as the Pacific AC Intertie ("PACI") and at times referred to individually as "PACI-P" and "PACI-W," run from the Malin substation in Oregon to the Tracy substation in central California, ending at the Round Mountain substation. The PACI is physically located within the geographic area of the CAISO-controlled grid, although the CAISO is not an owner of the PACI. The Captain Jack substation and the Malin substation are electrically connected; likewise the Tesla substation and the Tracy substation are electrically connected. The basic structure

of the California-Oregon Intertie looks like this:



The IBAA Proposal focuses on SMUD and Turlock, two independent but interconnected "balancing authority areas," *see Sacramento Mun.*, 616 F.3d at 524 n.2, that draw power from the Pacific Northwest over the California-Oregon Intertie when purchasing this power is cheaper than generating it locally. Together they have twelve interconnections with the CAISO-controlled grid. The CAISO was concerned that it would be unable to model power flows and calculate locational marginal prices accurately for these entities due to "parallel flows," also known as "unscheduled flows." Although a "scheduled" or "contract" flow is planned between two points over a specific path, the power does not always flow over the scheduled route if there are other paths; it flows over the path of least resistance, creating a parallel flow. In some instances, as in the California-Oregon Intertie, the presence of parallel lines means that when a scheduled flow occurs there will necessarily be an unscheduled flow over parallel lines.

The CAISO's proposed solution in the IBAA Proposal was two-fold. It first combined SMUD and Turlock into a single IBAA for purposes of the full network model. And, second, to

rectify concerns regarding market manipulation and to model the IBAA connection points more accurately, the IBAA Proposal used a "single hub" approach whereby one default proxy price would be selected for all twelve connection points: All imports into the CAISO system from the IBAA would be priced as if they originated at the Captain Jack substation in Oregon; all exports from the CAISO system to the IBAA would be priced at a hypothetical "SMUD hub." Alternatively, SMUD and Turlock or future IBAA entities could enter into individual market efficiency enhancement agreements ("MEEAs") with the CAISO to receive a more accurate pricing structure upon providing the CAISO with information allowing it to verify the location and operation of the resources used to carry out interchange transactions between the CAISO-controlled grid and the IBAA.

The CAISO explained that the elements of its single hub, default pricing point proposal were justified by and "result[ed] directly from the limited type and amount of information the CAISO expects to receive from the IBAA [e]ntities." IBAA Proposal at 5. The Commission agreed, concluding that "by using a more accurate representation of the locations of external resources used to implement interchange transactions in the CAISO's full network model the IBAA [P]roposal will help to ensure that interchange transactions from the SMUD and Turlock balancing authority areas are appropriately valued for purposes of managing congestion on the CAISO-controlled grid, and reduce the likelihood of significant differences between scheduled flows and actual flows." Order ¶ 5. Accordingly, the Commission found the CAISO tariff, as amended by the IBAA Proposal, was "just and reasonable" under the Federal Power Act ("FPA"), 16 U.S.C. § 824d, but conditioned its approval on the modification of the IBAA Proposal in several ways, including that the CAISO address potential over-collection for charges based upon losses of energy during transmission due to the modeling of parallel flows, specify in its tariff the information to

be provided for establishing MEEAs, and treat such information as confidential. *See* Order ¶¶ 6 & n.6, 8. The CAISO satisfied the conditions in additional filings and the Commission denied rehearing, rejecting various challenges, some of which are renewed in the pending petitions. *See* Rehearing Order ¶ 1.

**II.**

Petitioners challenge the Commission's jurisdiction to review and approve a tariff amendment governing the pricing of electricity in the CAISO market, and also contend that the Commission's acceptance of the IBAA Proposal amending the CAISO tariff was neither a reasonable exercise of its discretion under the FPA nor supported by substantial evidence of record.

The court "review[s] [the Commission's] orders under the arbitrary and capricious standard and uphold[s] [the Commission's] factual findings if supported by substantial evidence." *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010) (citation and quotation marks omitted). The court must affirm the Commission's orders "so long as [the Commission] examine[d] the relevant data and articulate[d] a . . . rational connection between the facts found and the choice made. In matters of ratemaking, our review is highly deferential, as [i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission." *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009) (second, third, and fourth alterations and ellipsis in original) (citations and internal quotation marks omitted). Nonetheless, the Commission must respond to objections and address contrary evidence in more than a cursory fashion. *See NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1163-65 (D.C. Cir. 1998). In reviewing the Commission's assertion of jurisdiction under the FPA and its interpretation of a Commission-approved contract, the court applies the familiar

two-step analysis under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-44 (1984). *See S. Cal. Edison Co. v. FERC*, 502 F.3d 176, 181 (D.C. Cir. 2007); *Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 673 (D.C. Cir. 2007) ("*TANC*").

**A.**

Jurisdiction. FPA Section 201(f) provides that "[n]o provision in . . . subchapter [II regulating electric utility companies engaged in interstate commerce] shall apply to, or be deemed to include . . . any political subdivision of a State . . . or any agency, authority, or instrumentality of . . . the foregoing . . . unless such provision makes specific reference thereto." 16 U.S.C. § 824(f). Section 205 requires the Commission to ensure that the rates and charges "made, demanded, or received by any public utility" are "just and reasonable." *Id.* § 824d(a). Section 201(e), in turn, defines "public utility" to be "any person who owns or operates facilities subject to the jurisdiction of the Commission." *Id.* § 824(e). The court has concluded that by these provisions "Congress has . . . specifically exempted governmental entities from subchapter II of the FPA." *TANC*, 495 F.3d at 674.

Petitioners, joined by intervenor Municipals, contend that the Commission exceeded its jurisdiction in approving the IBAA Proposal because FPA Section 201(f) "unequivocally exempts" governmental entities from the Commission's rate-setting authority under FPA Sections 205 and 206, *id.*, and their voluntary participation in such markets does not give the Commission authority to regulate their rates, *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 924 (9th Cir. 2005). The Commission rejected this challenge, concluding that approving the IBAA Proposal was within its "core authority" for four principal reasons: (1) the amended CAISO tariff applied only to scheduled transactions that affect the CAISO-controlled grid and the IBAA Proposal "establishes only the rates, terms and

conditions for sales in the CAISO's market"; (2) in *National Association of Regulatory Utility Commissioners v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) (*"NARUC"*), the court upheld the Commission's authority to regulate all aspects of wholesale energy sales; (3) an IBAA entity's voluntary choice to participate in the CAISO market includes a choice to operate under the CAISO tariff; and (4) *Bonneville*, which addressed the Commission's authority to order refunds under FPA Section 206, does not limit the Commission's jurisdiction here because it was not ordering a non-jurisdictional entity to issue a refund. *See* Rehearing Order ¶¶ 20-25. Petitioners and Municipals maintain that these four bases for exercising jurisdiction impermissibly focus on the nature of the transactions and not the identity of the sellers. As noted, the court affords *Chevron* deference to the Commission's interpretation of its jurisdiction under the FPA. *See TANC*, 495 F.3d at 673.

Although the jurisdictional line was more easily drawn when the electricity world was "neatly divided into spheres of retail versus wholesale sales, and local distribution versus transmission facilities," the "unbundling" of services and the general restructuring of electricity markets in the last two decades has made line-drawing more complex. *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 691 (D.C. Cir. 2000). Rather than allowing the mere presence of a governmental entity to defeat the Commission's assertion of jurisdiction over a public utility, the court has accepted that jurisdictional and non-jurisdictional entities are regularly integrated co-participants in modern power markets. Thus, in *NARUC*, 475 F.3d at 1281, where facilities were jointly owned by private firms and states, the court held that the Commission's "assertion of jurisdiction over specified transactions, even though affecting the conduct of the [state] owner(s) with respect to its facilities, is not per se an exercise of jurisdiction over the facility," observing that the contract modifications mandated by Order No. 888 forced non-

jurisdictional owners to permit certain transactions to occur over the jointly owned facility. *Id.* at 1281-82. The court observed that the Commission was "exercising jurisdiction only over 'interconnections to a "distribution" facility when the facility is included in a public utility's Commission-filed [Open Access Transmission Tariff] *and* the interconnection is for the purpose of facilitating a jurisdictional wholesale sale of electric energy.'" *Id*. at 1282 (emphasis added in opinion) (quoting Order No. 2003-A, 106 FERC ¶ 61,220 (2004), at 31,075 P 730). Likewise, "[the Commission] may analyze and consider the rates of non-jurisdictional utilities to the extent that those rates affect jurisdictional transactions." *TANC*, 495 F.3d at 671 (citation and quotation marks omitted).

In *Sacramento Municipal*, 616 F.3d 520, the court rejected a challenge to the Commission's jurisdiction to approve the initial, pre-IBAA Proposal phases of the CAISO's market redesign, including its decision to implement locational marginal pricing. The Imperial Irrigation District argued in that case that the Commission exceeded its authority in assessing marginal loss charges to transactions involving Imperial's use of transmission ownership rights, i.e., contractual entitlements to use facilities it owns within the CAISO balancing authority area. *See id.* at 535-36. The Commission responded by making clear that marginal loss charges would be applied "only to transactions that . . . involve injections and withdrawals from the [CAISO] grid and could not be assessed where the [transmission ownership rights] holder has no point of interface with the [CAISO]." *Id.* at 536 (ellipsis and second alteration in original) (citation and internal quotation marks omitted). The court upheld the Commission's assertion of jurisdiction:

> Far from compelling Imperial [Irrigation District] to become a participating transmission owner of California ISO, [the Commission] merely permitted the

> ISO to charge Imperial for the costs incurred by the ISO when Imperial conducts transactions that cause transmission losses on the ISO's grid. The Commission's proper exercise of its power to regulate California ISO's rates was not transformed into a violation of its statutory jurisdiction by dint of its incidental effect on Imperial.

*Id.* The Commission was not charging Imperial to use its own facilities; rather, the charges stemmed solely from Imperial's use of CAISO-controlled facilities and attendant services. *Id.* at 537. The court noted a similar distinction had been drawn in *Michigan Public Power Agency v. FERC*, 405 F.3d 8, 13 (D.C. Cir. 2005).

The same reasoning controls here. In denying rehearing, the Commission emphasized that "[t]he IBAA Proposal is . . . limited, only applying to scheduled transactions that impact the CAISO-controlled grid." Rehearing Order ¶ 21. And "since the IBAA Proposal only applies to scheduled transactions that impact the CAISO-controlled grid, only a party that chooses to use the CAISO-controlled grid is affected." *Id.* ¶ 23. In short, "the IBAA Proposal establishes only the rates, terms and conditions for sales in the CAISO's markets." *Id.* ¶ 25. Although petitioners and Municipals would distinguish *Sacramento Municipal* because the IBAA Proposal's regulation of the rate at which non-jurisdictional entities may sell energy to the CAISO is not, in their view, an "incidental effect" of regulating jurisdictional entities, the fact remains that the Commission is only regulating the CAISO's actions and the manner in which it calculates rates on the CAISO-controlled grid. Petitioners' and Municipals' rates are not the object of the Commission's Orders, and the Commission does not purport to interfere impermissibly with the manner in which these municipalities calculate their own rates. *See NARUC*, 475 F.3d at 1280. In the highly integrated and complex California energy

market, the Commission's regulation of a jurisdictional entity, such as the CAISO, "may, of course, impinge as a practical matter on the behavior of non-jurisdictional ones." *Id.* But, as in *Sacramento Municipal*, this is not a basis for concluding that the Commission has exceeded its jurisdiction under the FPA.

Contrary to petitioners' position, neither the Ninth Circuit's opinion in *Bonneville* nor this court's opinion in *TANC* preclude the Commission from asserting jurisdiction over the IBAA Proposal. *Bonneville* simply holds that the Commission may not order a non-jurisdictional entity to issue a refund, 422 F.3d at 920, and, more critically, the Commission is not regulating petitioners' rates; it is regulating only the CAISO's. Indeed, *Bonneville* distinguishes a circumstance in which the Commission orders the CAISO, as opposed to a governmental entity, "to operate the market in a different fashion or to set a market-clearing price for power on a going-forward basis." *Id.* For the same reason, the Commission does not run afoul of the prohibition in *Bonneville*, adopted by this court in *TANC*, that the Commission's "refund authority under the FPA is ultimately determined by the 'identities of the sellers subject to the refund order.'" *TANC*, 495 F.3d at 674 (quoting *Bonneville*, 422 F.3d at 911).

Petitioners and Municipals also miss the mark in faulting the Commission for justifying its assertion of jurisdiction on non-jurisdictional entities' voluntary participation in the CAISO market. In denying rehearing the Commission was not suggesting that it was asserting jurisdiction by agreement; rather, the Commission was illustrating that governmental entities are affected by the IBAA Proposal only insofar as they choose to transact within the CAISO-controlled grid. *See* Rehearing Order ¶ 22. Thus, petitioners' and Municipals' reliance on *Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459, 463 (D.C. Cir. 2005), is misplaced.

Municipals fare no better in responding that the IBAA Proposal is not limited to the CAISO-controlled grid because it incorporates prices at Captain Jack outside of the grid and makes reference to modeling "external" resources. Although the CAISO's full network model uses proxies and data from outside the CAISO-controlled grid, the IBAA Proposal sets rates only for transactions on the CAISO-controlled grid. Moreover, the Commission may properly "analyze and consider the rates of non-jurisdictional utilities to the extent that those rates affect jurisdictional transactions." *TANC*, 495 F.3d at 671 (citation and quotation marks omitted).

**B.**

Existing Contracts. The Amended Owners Coordinated Operation Agreement ("Agreement") between Pacific Gas and Electric Company ("PG&E"), participants in the California-Oregon Transmission Project ("COTP"), and participants in the Western Area Power Administration addresses the joint operation of the California-Oregon Intertie, the three-line parallel system comprised of the COTP (between Captain Jack and Tesla) and the dual PACI-P and PACI-W lines (between Malin and Tracy). Because the Agreement governed different subject matter than the IBAA Proposal, the Commission rejected the argument that approval of the IBAA Proposal violated the Agreement. *See* Order ¶¶ 246-255; Rehearing Order ¶¶ 254-260. Petitioners and the Commission agree that the *Mobile-Sierra*[4] doctrine prohibits the Commission from approving the IBAA Proposal if it impinges upon rights protected under the Agreement. The issue, then, is whether the Commission's determination that the Agreement and IBAA Proposal do not conflict was reasonable.

---

[4] *See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956).

A variation of the two-step *Chevron* analysis frames the arbitrary and capricious review. *See Entergy Servs., Inc. v. FERC*, 568 F.3d 978, 981-82 (D.C. Cir. 2009). The court "first consider[s] *de novo* whether [the Agreement] unambiguously addresses the matter at issue. If so, the language of the Agreement controls for [the court] must give effect to the unambiguously expressed intent of the parties." *S. Cal. Edison*, 502 F.3d at 181 (citation and internal quotation marks omitted). Familiar contract interpretation principles apply. Thus, ambiguity arises where an agreement "is reasonably susceptible of different constructions or interpretations." *Iberdrola Renewables, Inc. v. FERC*, 597 F.3d 1299, 1304 (D.C. Cir. 2010) (citation and quotation marks omitted). Further, "[i]n construing tariffs, courts and agencies must look to the four corners of the tariff and consider the entire instrument as a whole." *Consol. Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1545 (D.C. Cir. 1985). And "[t]he purposes for which a tariff was imposed should be considered . . . for 'to decide the question of the scope of [a] tariff without consideration of the factors and purposes underlying the terminology employed would make the process of adjudication little more than an exercise in semantics." *Id.* (second alteration in original) (quoting *United States v. W. Pac. R.R.*, 352 U.S. 59, 67 (1956)).

Section 5 of the Agreement provides:

> This Agreement governs the coordinated operation of the PACI and COTP. It is the intent of the Parties to maintain the System as coordinated facilities to benefit its Transfer Capability. Except as to the use of the Tesla ByPass provided under this Agreement and as necessary to perform curtailment sharing obligations under Section 11 of this Agreement, no Party provides or shall be required to provide any transmission or other electric service to another Party under this Agreement.

Section 8.4 provides, in pertinent part, that

> [t]he System shall be operated as a coordinated three-line transmission system. No Party shall be charged any rate and PG&E shall not be charged any transmission loss for any power, which flows over the System or over the Tesla ByPass. . . . Except to the extent necessary for sharing Curtailments, no Party shall have a right under this Agreement to have any of its power delivered on or otherwise have the use of transmission facilities owned by another Party.

Although the CAISO agreed to "honor" the Agreement, *see* Order ¶ 247, the extent to which the Agreement restricts the CAISO is unclear. Insofar as it is binding, the Commission concluded that the Agreement, which provides for shared use, coordinated operation, maintenance, and planning of the California-Oregon Intertie, "does not concern how energy is priced once it enters the CAISO-controlled grid" and therefore presents no conflict with the IBAA Proposal. *Id.* Viewing section 5 to "denote[] the scope of the Agreement," the Commission concluded that the prohibition on charges in section 8.4 was limited to the coordinated operation and maintenance of the PACI and COTP. *Id.* ¶ 248; *see also* Rehearing Order ¶ 225.

Petitioners contend that section 8.4 unambiguously precludes the CAISO from "charg[ing] any rate . . . for any power, which flows over the System." As they see it, section 8.4 "reflects the Parties' intent to shield one another from charges that might otherwise be imposed as a result of their coordinated operations, even where the power flows through the CAISO-controlled grid." Reply Br. 8. But section 8.4 must be read in conjunction with section 5, as they are both part of a single agreement. *See Consol. Gas Transmission*, 771 F.2d at 1545. On its face the Agreement does not concern the manner in which

the CAISO sets rates in its own market. Although section 8.4 refers broadly to "any rate" for power flowing over the system, the reach of this provision cannot extend beyond the scope of the Agreement itself, which is stated in section 5.

Seeking to avoid the effect of section 5, petitioners maintain that the Commission has erroneously presumed a conflict between the two sections. But the Commission simply read one section in light of the other. *See* Order ¶ 248. In addition, the Commission's interpretation is consistent with the Agreement's general purpose, *see Consol. Gas Transmission*, 771 F.2d at 1545, to ensure the combination of the three power lines (COTP, PACI-P, PACI-W) does not result in parallel flow charges to the Parties, which they would otherwise incur. Indeed, petitioners acknowledge that "[t]he Agreement prohibits *the Parties* from assessing *each other* for 'any' such power flows." Reply Br. 8. The IBAA Proposal does not permit a party to the Agreement to charge another party for flows over the three-line system. It is irrelevant, as the Commission maintains, that the PACI is part of the CAISO grid.

Petitioners relatedly contend that the Commission's adjustment of the IBAA Proposal to prevent potential overcollection of losses, *see* Order ¶¶ 106, 252, shows that the Commission is permitting losses to be charged for parallel flows in violation of the Agreement. The Commission directed the CAISO to remove these charges, however, in order to avoid having COTP customers that transact in the CAISO market pay the cost due to losses of energy during transmission reflected in the Captain Jack locational marginal price in addition to the same cost reflected in the existing COTP tariff. *See* Order ¶ 106. Such action has no relation to whether the parties to the Agreement may charge one another for parallel flows on the California-Oregon Intertie. The Commission acknowledged that section 8.4 of the Agreement "provides that parties cannot charge

a rate for these [parallel] flows." Order ¶ 252. But its decision to direct the CAISO "to revise the IBAA proposal to address any potential overcollection of losses," *id.*, does not indicate that a failure to remove these loss charges would have violated the Agreement. The Commission explained that "the IBAA proposal will not charge any rate for these flows over and above what it is doing *under the current tariff*." *Id.* (emphasis added). On rehearing, the Commission stated that it did not find such pricing to be prohibited by the Agreement. *See* Rehearing Order ¶ 258. The Commission's position on appeal, that "this adjustment was to make the [IBAA] rate consistent with other rate tariffs, not the Coordinated Operation Agreement," is thus supported by the record. Resp't Br. 40.

Because section 5 defines the scope of the Agreement to govern only the joint operation of the three power lines comprising the California-Oregon Intertie, and section 8.4 is properly read in light of section 5, the Commission reasonably concluded that the Agreement only prohibits the parties to the Agreement from charging each other for unscheduled use of another's lines associated with parallel flows and does not reach the IBAA Proposal, which concerns the CAISO's ability to set rates within its own market.

**C.**

Discrimination. FPA Section 205, in addition to requiring that all rates and charges be "just and reasonable," provides:

> No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service,

> facilities, or in any other respect, either as between localities or as between classes of service.

16 U.S.C. § 824d(b). To this end, upon finding that a rate is "unjust, unreasonable, unduly discriminatory or preferential," the Commission is required to "determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." *Id.* § 824e(a). "A rate is not 'unduly' preferential or 'unreasonably' discriminatory if the utility can justify the disparate effect." *Ark. Elec. Energy Consumers v. FERC*, 290 F.3d 362, 367 (D.C. Cir. 2002); *see also Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1515 (D.C. Cir. 1984). The court will not find a Commission determination to be unduly discriminatory if the entity claiming discrimination is not similarly situated to others. *Sacramento Mun. Util. Dist. v. FERC*, 474 F.3d 797, 802 (D.C. Cir. 2007).

In filing a revision to a tariff, the public utility bears the ultimate burden of demonstrating that the rate is not unduly discriminatory. *See Elec. Consumers*, 747 F.2d at 1515. Yet "[o]nly upon a [Section 205] complainant's showing that a rate design has different effects on similarly situated customers does the burden shift to the respondent [public utility] to justify those disparities." *Sw. Elec. Coop., Inc. v. FERC*, 347 F.3d 975, 981 (D.C. Cir. 2003). If the Commission determines the rate is not unduly discriminatory, as it did here, then petitioner-complainants bear the burden of "demonstrat[ing] that [the Commission's] policy judgments are arbitrary or capricious, a heavy burden indeed." *Transmission Access*, 225 F.3d at 714. This framework was made clear in *Sacramento Municipal*, 616 F.3d at 537-38, where the court rejected the contention that the Commission erroneously conflated the burden of proof when it "properly placed the initial burden of showing that the tariff proposal [wa]s just and reasonable on [the CAISO] . . . [t]hen,

after finding that the [CAISO] had established that it was 'just and reasonable' . . . [,] simply found that Imperial had failed to controvert that conclusion." Petitioners likewise overlook the shifting burdens and the standard of review in suggesting that the Commission impermissibly advances a *post hoc* argument on appeal, that petitioners failed to show the rates were unduly discriminatory, when the Commission had placed the initial burden on the CAISO to justify the tariff amendment, *see, e.g.,* Order ¶ 208; Rehearing Order ¶ 221.

On the merits, petitioners contend that combining SMUD and Turlock into an IBAA constituted unreasonable and undue discrimination, in violation of FPA Section 205, 16 U.S.C. § 824d. Rejecting this view, the Commission credited the CAISO's identification of six factors distinguishing SMUD and Turlock from other balancing authority areas, finding that "unique circumstances" justified the consolidation for purposes of the CAISO's market redesign. *See* Order ¶¶ 208-216; Rehearing Order ¶¶ 216-226. Petitioners now complain that the Commission failed to provide a reasoned response to evidence and objections advanced by parties, *see NorAm*, 148 F.3d at 1163-65, but the record is to the contrary.

In response to petitioners' objection to placing weight on the number, rather than the size, of the connections between two parallel systems, the Commission noted that the proposed "IBAA does, in fact, have several large interconnection points, including Tracy," making the SMUD-Turlock IBAA "highly interconnected with the CAISO with respect to the number, size, and distance between its interconnections with the CAISO-controlled grid." Order ¶ 212; *see also* Rehearing Order ¶ 218. Additional statements defeat petitioners' claim that the Commission did not conclude SMUD and Turlock connections were more significant than other areas. The Commission noted that the "sheer number of interconnections and the extent of the

parallel flows combined with its imbedded position within the CAISO grid" make the SMUD-Turlock IBAA the "most highly integrated interface with the CAISO." Order ¶ 212. The Commission also contrasted the IBAA's twelve interconnection points with the next largest balancing authority area, the Los Angeles Department of Water and Power, which has only four points. *See id*. Moreover, with respect to the degree of impact on the CAISO system, the Commission found that unscheduled flow data for SMUD and Turlock distinguished these entities from neighboring balancing authority areas. *See* Rehearing Order ¶ 220. The Commission also responded to petitioners' objection that the former integration of SMUD and Turlock with the CAISO was irrelevant, pointing out that this "detailed knowledge" helped inform the CAISO's understanding of challenges that might arise. Order ¶ 214. In sum, petitioners fail to show that the Commission did not examine the relevant data or articulate a rational connection between the facts found and the choice made, bearing in mind that the court's review is highly deferential. *See Alcoa*, 564 F.3d at 1347.

Petitioners persist, however, contending that the Commission failed to respond to comments raising the arbitrariness of "lumping" SMUD and Turlock together. This contention also fails. The Commission, citing evidence of two experts presented by the CAISO, explained that the high degree of integration between SMUD and Turlock justified the IBAA Proposal. *See* Order ¶ 210. On rehearing, the Commission pointed out that the CAISO had presented "*compelling data* that illustrates the significance of unscheduled flows between the SMUD and Turlock balancing authority areas and the CAISO-controlled grid." Rehearing Order ¶ 220 (emphasis added). This data compared SMUD and Turlock with other neighboring balancing authority areas, and documented the amount and frequency of unscheduled flows over a 12-month period. The Commission found that "[t]he evidence demonstrates that SMUD

and Turlock both experienced large and, in many cases, frequent deviations between scheduled and actual power flows." *Id.* The Commission noted that SMUD did not address this long-term data and that the petitioners' efforts to focus on individual factors and any one particular data set "miss the larger point of considering the totality of factors and unique characteristics of a potential IBAA." *Id.*; *see also id.* ¶ 221. Finally, the Commission reasonably found that because Turlock is "uniquely situated within the CAISO's balancing authority area with SMUD, making it possible for a schedule[d] [transfer] to be made from Turlock to the CAISO for power that is actually being sourced from within the SMUD balancing authority area or the Pacific Northwest, . . . it is important that the CAISO be better able to map such flows or reflect their source in its [locational marginal prices]." *Id.* ¶ 224.

Petitioners' remaining arguments fare no better. First, contrary to their suggestion, the Commission did not unreasonably reject evidence relating to flow rates. Rather, the Commission discussed in detail the parties' respective positions regarding the accuracy of the data and the difference between frequency, magnitude, and peak flow data. *See* Order ¶¶ 37-39. On rehearing the Commission noted that "SMUD's assertion that we ignored evidence it provided suggesting that flow reversals were 'grossly exaggerated' is incorrect. The Commission considered all submitted evidence in the record in making determinations regarding the IBAA Proposal." Rehearing Order ¶ 69. As the Commission points out, the fact that the CAISO's experts and data were credited over petitioners' is no reason to grant the petition because the court, acknowledging the Commission's expertise, "defers to the Commission's resolution of factual disputes between expert witnesses." *Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1236 (D.C. Cir. 2005).

Second, while petitioners correctly point out that future approval of other IBAAs does not justify undue discrimination against SMUD and Turlock, and that the availability of MEEAs — an agreement between the CAISO and an IBAA entity to share information — does not cure discrimination these considerations are of no aid to them here. The Commission identified no other entities suitable for IBAA treatment at the time of the challenged orders, and thus the Commission cannot be said to be treating similarly situated entities differently. *See Sacramento Mun.*, 474 F.3d at 802. If, in the future, the petitioners or others provide information that another balancing authority area equals or surpasses SMUD and Turlock on the measures relied upon by the Commission and the CAISO, then the IBAA Proposal will allow the CAISO to treat the similarly situated balancing authority area as an IBAA. Further, the Commission did not reject petitioners' discrimination challenges because MEEAs were available, but rather found the rates to be just, reasonable, and not unduly discriminatory even in the absence of MEEAs; it simply noted that the execution of MEEAs would "mitigate parties' concerns." Order ¶ 208.

Third, petitioners incorrectly suggest that the Commission impermissibly relied on a "totality of circumstances" approach. Unlike in *LeMoyne-Owen College v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004), on which petitioners rely, where the court overturned an agency decision that entirely ignored certain arguments made by the parties, here the Commission addressed the parties' arguments, identifying six factors that supported its decision and explaining how the IBAA Proposal met those factors. *See* Order ¶¶ 193-216; Rehearing Order ¶¶ 197-226. Consequently the Commission's reference to "multiple, non-exclusive factors," Rehearing Order ¶ 218, is far from a "totality of the circumstances" approach that serves as "simply a cloak for agency whim — or worse." *LeMoyne-Owen*, 357 F.3d at 61. Instead, as the CAISO suggests, it likely imparted that even if

petitioners could show that another entity satisfied one criterion for forming an IBAA, making the entity similarly situated to the SMUD-Turlock IBAA in one respect, this was insufficient to demonstrate discrimination because such entities, unlike the SMUD-Turlock IBAA, did not satisfy all six criteria.

Fourth, the Commission did not, as petitioners note, directly address some of the evidence regarding parallel flows or explain why certain experts' testimony was unpersuasive. But the overall explanation the Commission provided sufficed because it provided reasonable responses to petitioners' objections that were neither summary nor dismissive. *See NorAm,* 148 F.3d at 1163-65. The Commission could have expanded its discussion of the evidence on undue discrimination, but a point-by-point rebuttal is not necessarily required. *Cf. Lemoyne-Owen*, 357 F.3d at 60-61. As the court explained in *Transcontinental Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 922 (D.C. Cir. 2008) (citation and internal quotation marks omitted), even when the Commission's "explanation . . . left something to be desired, the decision as a whole and the rehearing decision clarify its analysis, and we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

**D.**

Proxy Prices. The Commission accepted the IBAA Proposal to use default import and export proxy pricing points to model the IBAA. *See* Order ¶¶ 82-92; Rehearing Order ¶¶ 58-70. Imports into the CAISO, i.e., sales from the IBAA entities to the CAISO, are given a locational marginal price as if they originated at the Captain Jack substation in Oregon; exports from the CAISO, i.e., sales from the CAISO to the IBAA entities, are given a locational marginal price at a hypothetical "SMUD hub," a composite point representing the average location of exports. *See* Order ¶ 64. As an alternative to these default locational marginal prices, the IBAA Proposal provided for MEEAs.

The Commission found this model and the underlying assumptions of the IBAA Proposal to be reasonable "given the available information on interchange transactions," Order ¶ 82, and "the absence of additional information . . . verifying an interchange transaction's source or sink," *id.* ¶ 83. It noted that the CAISO "has appropriately chosen to make an assumption that imports are likely to flow through Captain Jack and exports are likely to flow through the SMUD hub." *Id.* ¶ 82. It further agreed that the CAISO's experience from which it "anticipates that its proposal is needed to address unscheduled flows and effectively manage congestion," as applied here, reasonably supported the use of default proxy prices. *Id.* The Commission noted as well that IBAA entities could avoid the proxy price by providing confidential proprietary information on actual power sources through MEEAs. *See id.* ¶ 83.

In rejecting comments that the IBAA Proposal's use of the Captain Jack default proxy prices was unreasonable because it erroneously assumed Captain Jack to be the import source, the Commission explained that the CAISO "does not assert that *all* interchange transactions are sourced at Captain Jack," but "[r]ather, in the absence of additional information, it asserts that Pacific Northwest resources are likely to support interchange transactions since they are generally less expensive." Order ¶ 83. The Commission cited record evidence, submitted by the CAISO, demonstrating that "[t]ransactions that source from the Pacific Northwest (i.e. near Captain Jack) have very little flow through Tracy" and therefore "[m]odeling these transactions as if they source at Tracy will result in an inaccurate model of congestion, since the transaction's actual flows will not match the scheduled flows." *Id.* ¶ 83 n.67. Finally, the Commission explained that "[w]hile a default pricing and modeling mechanism may not reflect the actual sourcing location of an interchange transaction, as the parties contend, it does reflect a conservative proxy that allows the CAISO to better manage

congestion on its system and will reduce incentives for artificial scheduling." Order ¶ 83; *see also id.* ¶ 90.

Petitioners challenge as arbitrary and capricious the Commission's determination that the default proxy prices for the IBAA were just and reasonable. They offer four grounds, none of which ultimately is persuasive. First, petitioners challenge the reasonableness of the assumption that IBAA entities use inexpensive Pacific Northwest power to schedule imports into the CAISO, but do not challenge the use of the proxy system itself. Their principal objection is that the Commission failed to address uncontradicted evidence demonstrating the IBAA entities use power from the Pacific Northwest to serve their own loads, rather than re-selling that power to the CAISO.

Petitioners' complaint about the different assumptions that underlie the default prices charged for imports and for exports is misdirected; the Commission did not mistakenly treat those assumptions as established facts. Rather, as the Commission explained, the default prices were based on flow data used to accomplish the CAISO's purpose of eliminating arbitrage opportunities. *See* Order ¶ 83. The use of proxy pricing, as the CAISO explains in its brief, focused not on the intended ultimate use of energy purchased by the IBAA entities but on the power flow, and the CAISO studies showed that 15% or less of energy passing through Captain Jack flowed through Tracy and "[m]ost of the remainder, 66% of the power flows, entered the ISO system through the Pacific AC Intertie." Intervenor CAISO Br. 25.

The Commission adopted this analysis in rejecting petitioners' evidence and contrary views. *See* Order ¶¶ 90-92. The Commission concluded that absent more detailed information from IBAA entities about generation sources, imports into the CAISO are likely to flow through the Captain

Jack substation, supported by resources from the Pacific Northwest. The CAISO flow studies support this finding. Moreover, the Commission noted, petitioners may avoid default prices by providing accurate information to the CAISO, either through MEEAs or otherwise.

Second, petitioners object that the Commission's failure to remedy duplicative congestion charges is irreconcilable with its recognition that default IBAA prices account for parallel flows. The Commission ordered the CAISO to prevent double-charging for losses flowing over the COTP, one of the three California-Oregon Intertie lines, and explained why there is no comparable congestion duplication to be eliminated:

> [T]he congestion will not arise due to capacity limitations on the California-Oregon Intertie. Rather, the congestion will arise due to the capacity limitations of other elements of the CAISO-controlled grid which, under normal operations, will be the limiting factors for scheduling interchange transactions that also use the California-Oregon Intertie. Said another way, any congestion that is reflected in [locational marginal prices] applicable to interchange transactions that use the California-Oregon Intertie will be attributable to binding constraints, not on the intertie, but on the other elements of the CAISO-controlled grid.

Order ¶ 105; *see also* Rehearing Order ¶ 82. Petitioners maintain that the Commission failed to address record evidence demonstrating that their congestion charges will increase under the IBAA Proposal, creating an "overcollection." But such evidence does not undermine the Commission's point that the CAISO charges are not for congestion on the California-Oregon Intertie. The Commission, noting evidence submitted by the CAISO, explained that the charges are for congestion on the

CAISO's own underlying 230 kilovolt line and "other elements of the CAISO-controlled grid," not for congestion on the California-Oregon Intertie. *See* Order ¶ 105 & n.97 (citing IBAA Proposal Ex. ISO-1, at 88-89). Thus, a customer transacting in the CAISO market will pay one charge for using the California-Oregon Intertie and another charge for any congestion created on the CAISO-controlled grid.

Third, petitioners object that the Commission's approval of the default price for imports was inconsistent with its finding that such a rate design "may, in limited circumstances, create an artificially low price" for energy. Order ¶ 120. Quoting *Federal Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 399 (1974), petitioners maintain the FPA "does not permit even a 'little unlawfulness'" with respect to rates. Pet'rs Br. 56. But *Texaco* concerned a total exemption for small producers from regulation under the Natural Gas Act, 15 U.S.C. §§ 717 et seq., *see Texaco*, 417 U.S. at 383, whereas the Commission's approval of the IBAA Proposal is based on its consistency with the FPA's Section 205 requirement that rates be "just and reasonable," 16 U.S.C. § 824d(a). That a proxy price will deviate from the market price in limited circumstances does not mean it is necessarily unjust and unreasonable. As the Supreme Court cautioned in *Texaco*, 417 U.S. at 397, in some circumstances "the prevailing price in the marketplace cannot be the final measure of 'just and reasonable' rates mandated by the [Natural Gas] Act." *See also id.* at 397-99. If, as petitioners suggest, the proxy price could never deviate from the market price without becoming unlawful, then proxy pricing would be unlawful as a matter of law unless it was in fact the market price at all times. The court has recognized that proxy prices can be just and reasonable, if supported by record evidence. *See, e.g., Oxy USA, Inc. v. FERC*, 64 F.3d 679, 695 (D.C. Cir. 1995). Petitioners cite no authority to the contrary.

Finally, the Commission gave a reasoned explanation for rejecting petitioners' suggestion that the Captain Jack price could lead to substantially reduced imports creating instability on the CAISO-controlled grid. Essentially, the Commission concluded that the proxy prices generate benefits to all entities using the CAISO-controlled grid because SMUD and Turlock cannot cause inaccurate market prices and infeasible scheduling. In the Commission's view, the use of locational marginal pricing would strengthen the market by accurately reflecting market demand across the power grid and facilitating energy transactions. As the Commission stated, the IBAA Proposal "is unlikely to substantially decrease imports to the CAISO." Order ¶ 111. Market supply and demand would prevent a decrease in imports large enough to affect system stability, and while "trading opportunities may be lost" when the Captain Jack locational marginal price falls below the cost of generating power locally, Order ¶ 108 (citation and quotation marks omitted), petitioners offered no evidence that this would occur all or even a large part of the time. On rehearing the Commission noted that "[n]o evidence has been provided to support the legitimacy of the claim that the IBAA Proposal could undermine resource adequacy programs or harm reliability in the region." Rehearing Order ¶ 99. Further, the Commission observed, "the IBAA proposal does not change the resource adequacy program" and thus will not "lead to reliability or resource adequacy problems for the CAISO." Order ¶ 112. The Commission's response to petitioners' concern was reasonable and supported by record evidence submitted by the CAISO.

Accordingly, we deny the petitions for review.