# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 11, 2017       Decided November 28, 2017

No. 15-1447

STATE CORPORATION COMMISSION OF THE STATE OF KANSAS,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MIDCONTINENT INDEPENDENT SYSTEM OPERATOR, INC., ET
AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*John P. Coyle* argued the cause for petitioner. With him
on the briefs was *Amy E. McDonnell*.

*Beth G. Pacella*, Deputy Solicitor, Federal Energy
Regulatory Commission, argued the cause for respondent.
With her on the brief were *Robert H. Solomon*, Solicitor, and
*Lona T. Perry*, Deputy Solicitor.

*Benjamin C. Mizer*, Principal Deputy Assistant Attorney
General at the time the brief was filed, U.S. Department of
Justice, *Charles W. Scarborough*, and *Mark W. Pennak*,

Attorneys, were on the brief for intervenor Western Area Power Administration in support of respondent. *Jeffrey A. Clair*, Attorney, U.S. Department of Justice, entered an appearance.

*Jeffrey C. Genzer*, *Eli D. Eilbott*, *William D. Booth*, *Valerie L. Green*, and *Thomas L. Blackburn* were on the joint brief of intervenors Southwest Power Pool, Inc., et al. in support of respondent. *Natalie M. Karas* entered an appearance.

Before: KAVANAUGH and MILLETT, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In 1996, to facilitate the unbundling of wholesale power generation from power transmission and thus the development of competitive wholesale power markets, the Federal Energy Regulatory Commission required that power utilities under its jurisdiction adopt open access transmission tariffs. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, 61 Fed. Reg. 21,540, 21,541 (1996). FERC also encouraged these utilities to create regional transmission organizations ("RTOs") to operate transmission facilities on behalf of their members. *Braintree Elec. Light Dep't v. FERC*, 550 F.3d 6, 8 (D.C. Cir. 2008).

This case involves the terms on which an RTO and a set of utilities joined forces. The Southwest Power Pool ("SPP") is an RTO that at the time of the proposed integration operated facilities in eight states encompassing nearly 50,000 miles of transmission lines. Its members included Kansas utilities. The State Corporation Commission of the State of Kansas ("Kansas") is the petitioner here, representing Kansas power

consumers. During the period in question, the Integrated System was an adjacent, 9,500-mile transmission system in the Upper Great Plains Region. SPP and three of the Integrated System entities, known here as the IS Parties, negotiated an integration of their facilities to take effect on October 1, 2015.

Pursuant to § 205 of the Federal Power Act, 16 U.S.C. § 824d, SPP filed with FERC revisions to its tariff that reflected the parties' agreement. Over the objections of Kansas, FERC approved the revisions as just, reasonable, and not unduly discriminatory, *Sw. Power Pool, Inc.*, 149 FERC ¶ 61,113 (2014) ("Order"), and affirmed the Order on rehearing, *Sw. Power Pool, Inc.*, 153 FERC ¶ 61,051 (2015) ("Rehearing Order").

Kansas's objections are in substance twofold. First, it claims that the Commission wrongly accepted a rate structure that disadvantaged the SPP participants. Second, it claims that in accepting SPP's calculation of the benefits that the merger afforded SPP, the Commission unreasonably accepted data challenged by Kansas. Thus FERC's decision was not supported by substantial evidence, 16 U.S.C. § 825*l* (b), or reasoned decision-making, 5 U.S.C. § 706(2), see also *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and was further marred by FERC's failure to conduct an evidentiary hearing in the face of factual disputes that Kansas claims to have required one. We deny the petition for review.

\* \* \*

*Cost allocation*. Kansas objects to the way the parties agreed to allocate the costs of "legacy" facilities. Here these are facilities with a "need by" date before October 1, 2015, or, approximately, facilities planned and constructed by the proposed time of the SPP-IS Parties' joinder. The tariff

approved by FERC, reflecting the agreement of the two groups, provided that these facilities would continue to be paid for by the utilities in whichever pre-integration entity—SPP or the IS Parties—had planned and constructed them.

Kansas argues, in effect, that by accepting these provisions SPP got taken for a ride. It forewent the benefits potentially afforded by an alternative allocation system, which would have charged legacy costs in the SPP region to the IS Parties as well. By Kansas's expert's calculations, these foregone benefits swamped SPP's estimate of the transaction's benefits to SPP— $334 million over ten years. Joint Appendix ("J.A.") 341-43, 360-61. Kansas's expert estimates that SPP would have received another $475 million in revenue under a system in which the IS Parties were required to pay for use of SPP legacy facilities. *Id.* Kansas thus argues that SPP's choice and the Commission's approval make the deal a loser for SPP, and also violate controlling norms of ratemaking.

In upholding the tariff, FERC characterized the integrating parties' plan as "a practical, reciprocal cost allocation approach for facilities in service before the integration date. . . . [C]osts for such legacy facilities in the Integrated System region will be allocated to the Integrated System Parties; likewise, costs for legacy facilities in the pre-integration SPP region will be allocated to the pre-integration SPP membership." Rehearing Order at P 41. It reasoned that such allocation methods were just and reasonable because they "reflect prior investment decisions and the fact that existing facilities were built principally to support load within the sub-region." *Id.* FERC's decision to approve similar arrangements has withstood judicial review in analogous circumstances. See *Illinois Commerce Comm'n v. FERC*, 576 F.3d 470, 474 (7th Cir. 2009).

FERC accurately described the agreement as reciprocal. It would be difficult to label it otherwise, as the agreement and FERC's approval assigned each side's legacy costs to the power consumers in that side. The reciprocity of the arrangement alone undermines Kansas's expert's idea that SPP left $475 million lying on the table—a point FERC emphasized in favoring SPP's expert testimony on this point over that of Kansas's expert. Rehearing Order P 41. Kansas never suggests any reason to believe that the IS Parties would have agreed to share SPP members' legacy costs without demanding that SPP members share the IS Parties' legacy costs, and perhaps give other concessions as well.

We note for purposes of clarity that even if we assumed (as Kansas does) that an arrangement giving SPP the extra $475 million was available, SPP's failure to achieve that arrangement would not make the actual transaction a negative for SPP—only less positive than it might have been. Kansas's hypothetical $475 million is an opportunity cost, not an out-of-pocket cost.

Of course, an arrangement could be reciprocal and yet violate critical norms of ratemaking. So Kansas contends, in a series of attacks that have in common a reliance on Kansas's misreading of various precedents. First, it points to our decision in *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 355 (D.C. Cir. 2014), characterizing it as a FERC (and Circuit) precedent "requiring allocation of transmission costs based on benefits where a utility joins a regional transmission organization." But *FirstEnergy* provides no basis for saying that FERC imposed any such requirement or that we endorsed its doing so. The complaining energy system had entered an RTO (PJM) without challenge to the latter's pre-existing provision allocating certain costs to a new entrant, including facilities based on investment decisions made before the joinder. *Id.* at 351, 355. It then sought a finding from the

Commission that PJM's rate structure would be unjust and unreasonable unless the entrant were exempted from that provision. In a decision applying § 206, 16 U.S.C. § 824e, under which the complaining party has the burden to show that the rates challenged are unjust and unreasonable, 758 F.3d at 353, FERC rejected FirstEnergy's position, finding that the costs in question "related to the benefits" of joinder, and that, having elected to proceed in the face of those costs, FirstEnergy could not now claim that the cost allocation methodology "created a barrier to entry," *id*. at 351 (internal quotation marks omitted). Indeed, more generally, FERC had urged upon the merging parties the desirability of a negotiated cost allocation made in light of what each party had to offer. *Am. Transmission Sys., Inc. FirstEnergy Serv. Co.*, 129 FERC ¶ 61,249, P 114 (2009). FERC ultimately accepted the outcome resulting from whatever negotiations occurred, exactly as it did here, and later refused to upset that outcome in the § 206 proceeding reviewed in *FirstEnergy*, a refusal that we affirmed.

Kansas also claims that SPP-specific precedent calls for requiring a new entrant to share the costs of SPP's legacy facilities and that failure to follow that precedent here renders the resulting rate unduly discriminatory. Of course, a difference in rate design can be discriminatory only if the contested design "has different effects on similarly situated customers," and even then only if the differences cannot be justified. *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 549 (D.C. Cir. 2010); *Ark. Elec. Energy Consumers v. FERC*, 290 F.3d 362, 367 (D.C. Cir. 2002).

The precedent invoked is SPP's apparent former practice of requiring new entrants to pay a share of SPP's legacy costs on entry. But here the Commission pointed not only to its general expectation that a "new entrant proposal will be the result of a collaborative effort," Rehearing Order at P 40, but also to characteristics of this merger that Kansas does not claim

to have been matched in the prior entries to SPP: increased efficiency and reliability, improvement in SPP's dispatch of power on its western edge (the part most directly affected by inclusion of the IS Parties), and a lower price of energy by virtue of reduced needs for generation curtailment. *Id*. at P 21. We see no basis for a claim of undue discrimination.

*Assessment of benefits from the merger*. Apart from mistakenly trying to reevaluate the merger transaction on the basis of an alternative rate allocation that it has not shown to have been plausible, Kansas claims a quite independent flaw in the Commission's estimate of a $334 million benefit to SPP. As its expert did before the Commission, J.A. 357-60, Kansas protests SPP's reliance on a study commissioned by the IS Parties and performed by the Brattle Group. Kansas appears to assert two objections: that SPP didn't perform the study itself and that Kansas never had an opportunity to verify its accuracy. As to the first, it is enough that, although SPP lacked direct access to the entire study, its staff had reviewed the study's "input assumptions and the results for reasonability," J.A. 87, and after conversations with Brattle "was confident relying on the information provided by Brattle and using [its data] for its calculation" of the probable benefits, *id*. 389.

Kansas's claim of lack of access to the study is somewhat exaggerated. Kansas in fact had access to a redacted, electronic version even before the start of the FERC proceedings involved here. See Respondent's Br. at 24 n.5 (giving the URL). And it had access to some publicly unavailable confidential data. J.A. 389 (alluding to data in confidential attachment). At no point does Kansas pinpoint either a special reason to question the Brattle Group study, or some debilitating feature of the redaction.

In any event, even if one omitted the SPP benefits that were substantiated by the Brattle study, the integration would result

in a substantial net benefit for SPP members—over $61 million over ten years.

*Evidentiary hearing*. Finally, Kansas challenges FERC's decision not to hold an evidentiary hearing on the disputed features of the record underlying its approval of the merger. But the presence of disputed factual issues does not ipso facto require an evidentiary hearing where the Commission can adequately resolve the issues without such a hearing. *Blumenthal v. FERC*, 613 F.3d 1142, 1144 (D.C. Cir. 2010). We review FERC's decision not to hold an evidentiary hearing only for abuse of discretion. *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 114 (D.C. Cir. 2014).

FERC did order a "trial-type" hearing for issues that it believed it could not resolve in the absence of a hearing. Order at P 17; Respondent's Br. at 27. But, for the challenges at issue here, FERC concluded that a hearing was unwarranted. Rehearing Order at P 20-21.

In disputing the benefits of the integration proposal and the validity of SPP's cost/benefit analysis, Kansas had an opportunity to present its contrary expert testimony as part of the written record. Kansas asserts that its expert's testimony was "simply ignored" by FERC. Not true. As the above discussion demonstrates, the testimony was considered, but rejected on the merits.

And while Kansas takes issue with SPP's results, it points to no vulnerability in the testimony of SPP's expert witness that could be better resolved with cross-examination than with analysis of the written testimony itself in light of all the information before the Commission. We therefore find no abuse of FERC's discretion. See *Blumenthal*, 613 F.3d at 1145.

9

* * *

The petition for review is

*Denied.*